IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

TYRONE BUTLER, #193422,           )
                                  )
        Plaintiff,                )
                                  )
v.                                )          CASE NO. 3:09-CV-652-MHT
                                  )                   [WO]
                                  )
JAMES CARLTON, et al.,            )
                                  )
        Defendants.               )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by Tyrone Butler ["Butler"], an indigent state inmate, challenging actions taken against him during his incarceration at the Alexander City Community Based Facility and Work Release Center.  In this complaint, Butler alleges that the defendants transferred him from the correctional facility in violation of his due process and equal protection rights. *Complaint - Doc. No. 1* at 3-4.  Butler names James Carlton, the warden of the work center; Kathy Holt, the director of central records for the Alabama Department of Corrections; and Robert Whatley, a certified registered nurse practitioner, as defendants in this cause of action.  Butler seeks declaratory relief and monetary damages for the alleged violations of his constitutional rights.  *Id*. at 4.

The defendants filed special reports and supporting evidentiary materials addressing

Butler's claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to treat these reports as motions for summary judgment.  *Order of September 8, 2009 - Doc. No. 12*.  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of these motions, the evidentiary materials filed in support thereof and the plaintiff's response to the motions, the court concludes the defendants' motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

---

[1] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord

3

deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motions for summary judgment, Butler is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant

of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will

not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (Summary judgment is appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*,

906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, Butler fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

### III.  DISCUSSION

### A.  Uncontested Relevant Facts

Butler suffers from diabetes and is insulin dependent. On June 22, 2009, correctional officials removed Butler from the work release program at the Alexander City Community Based Facility and Work Release Center and transferred him to the Kilby Correctional Facility. It is undisputed that correctional officials deemed this transfer necessary because medical personnel determined that Butler's diabetic condition necessitated more stringent monitoring and management than could be provided at a work release facility. Specifically, Butler continually exhibited extremely elevated blood sugar levels during his confinement at the Alexander City Community Based Facility and Work Release Center. Medical personnel at the work release facility counseled Butler regarding his diabetic condition and explained those measures necessary to regulate his blood sugar level, including following a proper diet, maintaining an exercise program and complying with prescribed medications. They also cautioned Butler that failure to properly manage his condition would likely result in his transfer from work release.

**B. Absolute Immunity**

Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing and under the undisputed circumstances of this case, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

**C.  Transfer from Work Release**

**1.  <u>Due Process</u>.**  Butler complains he was transferred from work release to a more

restrictive prison environment without notice of the reason for his transfer nor a hearing on the matter. *Complaint - Doc. No. 1* at 3. Butler argues that this transfer deprived him of due process regarding "participation in the work release program." *Id*.

The Due Process Clause provides that no state "shall deprive any person of life, liberty, or property without due process of law." The Supreme Court has identified two circumstances in which a prisoner, an individual already deprived of his liberty in the ordinary sense, can be further deprived of his liberty such that due process is required. "The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital). The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300; *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory 'good-time credits' without due process); *cf. Dudley v. Stewart,* 724 F.2d 1493, 1497-98 (11th Cir. 1984) (explaining how the state creates liberty interests). In the first situation, the liberty

9

interest exists apart from the state; in the second situation, the liberty interest is created by the state." *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999).

A convicted prisoner has no constitutionally protected right to confinement in a particular correctional facility. *Meachum v. Fano*, 427 U.S. 215, 224 (1976) (no liberty interest arising from Due Process Clause in obtaining transfer to less secure prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."); *see also Olim v. Wakinekona*, 461 U.S. 238, 245-246 (1983) (a prisoner has no constitutional right to be confined in a particular institution and may be subjected to an interstate transfer without implicating the Constitution).  Moreover, an inmate in the Alabama prison system has no constitutionally protected interest in the privileges bestowed upon him or confinement in the least restrictive prison environment because the resulting restraints are not so severe that they exceed the sentence imposed upon him. *Sandin v. Conner*, 515 U.S. 472, 485 (1995). Although the plaintiff's confinement in a more restrictive facility than the Alexander City Community Based Facility and Work Release Center may entail "more burdensome conditions" than that of a less secure facility, this confinement is "'within the normal limits or range of custody which the conviction has authorized the State to impose.' [*Meachum,* 427 U.S. at 225]; *see also Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)." *Sandin*, 515 U.S. at 478.

10

With respect to Butler's claim that he is entitled to participate in the work release program, this claim is likewise without merit as the law is well settled that an inmate has no constitutionally protected interest in work release because denial of this program does not impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. at 484; *Kitchen v. Upshaw*, 286 F.3d 179, 188 (4th Cir. 2002) (inmate denied permission to participate in work release has no constitutionally protected interest in work release because "it is clear that being denied permission to leave jail in order to work is nothing more than an ordinary experience of inmates."); *Codd v. Brown*, 949 F.2d, 879 (6th Cir. 1991) (prisoners have no inherent due process interest in work release); *see also Francis v. Fox*, 838 F.2d 1147 (11th Cir. 1988) (no liberty interest created by state laws or regulations which entitles an inmate to consideration for the work release program because the statutes and regulations establishing the program are framed in discretionary terms). Thus, this court must determine whether Butler's removal from work release and incarceration at a higher custody facility imposed on Butler the type of "atypical, significant deprivation" in which a state might create a liberty interest. *Sandin*, 515 U.S. at 486. The court finds that it did not.

"[T]he baseline for determining [restraints which constitute the requisite atypical and significant hardship] is ascertained by what a sentenced inmate may reasonably expect

to encounter as a result of his or her conviction...." *Griffin v. Vaughn*, 112 F.3d 703, 706 (3rd Cir. 1997). "*Sandin* does not permit [a federal court] to compare the prisoner's own life before and after the alleged deprivation.  Rather, [the court] must compare the prisoner's liberties after the alleged deprivation with the normal incidents of prison life. *See Sandin,* 515 U.S. at 485-86, 115 S.Ct. 2293.... Since an inmate is normally incarcerated in prison, [the plaintiff's] return to prison [from institutional confinement in a halfway house] did not impose atypical and significant hardship on him in relation to the ordinary incidents of prison life and, therefore, did not deprive him of a protected liberty interest." *Asquith v. Department of Corrections*, 186 F.3d 407, 412 (3rd Cir. 1999); *Dominique v. Weld*, 73 F.3d 1156, 1160 (1st Cir. 1996) (inmate summarily removed from work release program for penological reasons and transferred to medium security prison did not possess a protected liberty interest in remaining on work release because confinement within the medium security prison constituted "an 'ordinary incident of prison life.' It is not 'atypical.'"); *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 669 (8th Cir. 1996) (return of an inmate to prison after revocation of his work release status did not impose an atypical or significant deprivation under the *Sandin* test).

In light of the foregoing, the court concludes that neither the removal of Butler from the work release program nor his subsequent transfer to a more secure facility imposed "an atypical and significant hardship on [Butler] in relation to the ordinary incidents of prison

life." *Sandin*, 515 U.S. at 484. Thus, Butler did not possess a liberty interest in his continued participation in the work release program. Butler has therefore failed to state a cognizable due process claim and summary judgment is due to be granted in favor of the defendants.

    **2. <u>Equal Protection</u>**. To the extent that the complaint can be construed to allege a violation of equal protection based on plaintiff's removal from work release because of a medical condition, Butler is likewise entitled to no relief. The defendants deny that they took any discriminatory action against Butler due to his being a diabetic; rather, they maintain, and the relevant medical records demonstrate, that Butler was removed from work release and transferred to a more secure prison facility because health care personnel could not adequately monitor Butler or ensure his compliance with the treatment plan devised for his diabetic condition in the work release program. *Defendant Whatley's Exhibit A - Doc. No. 9-3* at 6.[2] Specifically, while incarcerated at the Alexander City Community Based Facility and Work Release Center, Butler was employed at a fast food restaurant, which provided him unimpeded access to numerous food items not approved for his diabetic diet. In addressing the allegations made by Butler, nurse practitioner Whatley states, in pertinent part, as follows:

    .... Since approximately November of 2007, I have worked as a nurse

---

[2]The treatment plan for management of Butler's diabetes included both compliance with a prescribed medication regimen and adherence to a strict diabetic diet.

practitioner responsible for the provision of medical services to inmates incarcerated within the ADOC system, including primarily inmates who have been assigned to the minimum security work release facility known as the Alex City Work Release Center. During this same period of time, I have worked under the direction and supervision of Michael Robbins, M.D., the medical director at Kilby Correctional Facility.

Alex City Work Release ("ACWR")... has an average daily population of around 400 inmates who are mostly health[y] individuals who do not require any consistent or significant medical attention or treatment on a day-to-day basis.... Inmates with chronic medical conditions [such as diabetes] who are housed at ACWR must demonstrate that their chronic medical conditions are well-controlled and that they do not require any monitoring, oversight or treatment by a full medical staff, which, for example, is available at a non-work release facility such as Kilby.

In order to provide for the medical needs of inmates at ACWR, I am present for a minimum of sixteen (16) hours per week which usually involves me seeing patients on Monday and Thursday of every week. During my visits these two days per week to ACWR, I am assisted by a licensed practical nurse and a nursing assistant. When I am present at ACWR, I conduct chronic care clinics which allow me to evaluate inmates incarcerated at ACWR with chronic medical conditions (like diabetes, hypertension, asthma and the like) and evaluate any inmates who have submitted sick call request forms requesting an examination for non-urgent medical complaints. Any inmates experiencing any medical emergencies at ACWR are immediately transported to the local hospital. Any inmate requiring evaluation by a physician is transported to Kilby for evaluation by Dr. Robbins....

.... [I]nmates at ACWR are not allowed to maintain their insulin on their person. The insulin vials and needles are stored in a secure location inside the health care unit at ACWR and, at appointed times, inmates at ACWR are escorted by the ACWR correctional staff to the health care unit where they provide the inmates with access to the insulin, supplies and blood sugar/finger-stick testing equipment. Diabetic inmates self-administer their insulin and are required to test their blood sugar level on a daily basis and record the results of such testing in a log maintained in the ACWR health care unit.

The overall condition of diabetic inmates at ACWR, as well as their medication and dietary compliance with the treatment plan provided to them, is monitored through various means including physical examinations, chronic

care clinics, blood sugar/finger-stick testing as well as lab testing.  While the blood sugar/finger-stick testing does provide a snapshot of an diabetic inmate's medication [and dietary] compliance, these values can fluctuate greatly and only offer a small amount of information regarding the management of diabetes.  However, a lab test known as a "Hemoglobin A1c" value provides a much more accurate and comprehensive measure of the overall management of diabetes.  In other words, a diabetic inmate's Hemoglobin A1c values are the true indicator of the management of their diabetic condition. Blood samples are drawn from diabetic inmates at ACWR at regular intervals (no less frequently than quarterly) in order to test their Hemoglobin A1c values.

During the first few months of 2009, I reported to my supervisors that there was a number of inmates at ACWR whose overall management of their diabetic condition was poor and required immediate attention. These concerns arose primarily out of the notably elevated Hemoglobin A1c levels for certain diabetic inmates at ACWR.  Mr. Tyrone Butler was one of the inmates at ACWR who had exhibited poor management of his diabetic condition....

Rather than immediately transferring the non-compliant diabetic inmates (including Mr. Butler) from ACWR to another facility where their condition could be more closely monitored, I recommended and Dr. Robbins agreed to adopt a proposed course of action which would permit these non-compliant diabetic inmates at ACWR to reverse their trend of non-compliance and thereby allow them to remain at ACWR, rather than at a non-work release facility.

Mr. Butler's diabetic condition has been monitored through the chronic care process since the outset of his incarceration. During the first nine (9) months of his incarceration, the medical personnel made efforts to educate Mr. Butler about his diabetic condition and the type of behavior and habits necessary to control his condition. In fact, prior to his arrival at ACWR [and while confined at Kilby in June of 2008], Mr. Butler exhibited a Hemoglobin A1c value of 7.6 ... which increased to 9.2 when he was tested on August 8, 2008 [by medical personnel at Kilby].  By December 3, 2008, his Hemoglobin A1c level had dangerously increased to 11.0.  Mr. Butler had exhibited signs of minimal control of his diabetic condition during the first months of his incarceration at Kilby, as evident through the blood sugar/finger-stick test results which were marginally compliant.  However, after his transfer to ACWR [and free-world job assignment], Plaintiff's blood

sugar/finger-stick test results began showing signs of non-compliance, which included several occasions when his blood sugar levels exceed[ed] 400, i.e. almost four times the expected value of 120 for morning test results. For example, on March 6, 2009, Mr. Butler recorded the results of his blood sugar/finger-stick test as 460, which is well beyond the tolerable level.

On March 9, 2009, I conducted a comprehensive diabetic educational seminar at ACWR. Mr. Butler attended all of the sessions and heard all of the presentations during the six and a half hour training session related to his diabetic condition and the various lifestyle choices that he should make in order to properly manage his condition. At the conclusion of the March 9, 2009, diabetic educational seminar for the ACWR, I notified all of the diabetic inmates that their continued incarceration at ACWR was dependent upon their management of their diabetic condition. I further informed [the inmates] that, if they ... demonstrated an abnormal Hemoglobin A1c during the upcoming chronic care clinic, they would be required to either (1) reduce their Hemoglobin A1c level to a normal level, or (2) in the case of extremely high readings, reduce their Hemoglobin A1c level by a value of at least 1.5. The diabetic inmates, including Mr. Butler, were informed that their failure to achieve these goals for management of their diabetic condition would likely result in their transfer to a non-work release facility which would provide access to a full-time medical staff. When I evaluated Mr. Butler during the chronic care clinic following the March 9, 2009, diabetic training, his Hemoglobin A1c level was extremely elevated (i.e. 10.7 in comparison to a normal value of 4-6).

I evaluated Mr. Butler again on June 15, 2009, during a chronic care clinic in which I noted that Mr. Butler's Hemoglobin A1c values had actually increased by 0.1 since March, 2009. At that time, I elected to recode Mr. Butler as a "4" on the medical coding system, thereby characterizing him as exhibiting "Critical Issues, Requires Therapeutic Values" and recommending his incarceration at a facility providing medical care 24 hours per day, 7 days per week.

On June 22, 2009, the ADOC transferred Mr. Butler from ACWR to Kilby. After his arrival at Kilby, Mr. Butler was evaluated by the Kilby medical staff and was informed that he would need to obtain compliance with his diabetic treatment plan, including achieving a Hemoglobin A1c value of less than 7 before he would be considered for a transfer back to ACWR. Even after his transfer to Kilby, Mr. Butler has been re-evaluated regarding his diabetic compliance and continues to be coded as a level "4,"

meaning that he exhibits "Critical Issues, Requires Therapeutic Values" and must be incarcerated at a facility providing medical care 24 hours per day, 7 days per week.

My decision to recode Mr. Butler's condition in June of 2009 was based exclusively upon the results of his Hemoglobin A1c results and my professional opinion that his continued non-compliance with his medication and diet regimen poses serious, long-term risks to his well-being and ultimately his survival. During his incarceration at ACWR, Mr. Butler worked at a fast food restaurant which allowed him access to food [and drink items that are] extremely detrimental to his overall condition. At Kilby [or any other secure correctional facility] Mr. Butler will be provided a specific diabetic compliant dietary plan, which will allow him to demonstrate management of his condition and ultimately an opportunity to manage his condition in such a way to potentially permit his transfer back to ACWR....

*Defendant Whatley's Exhibit A - Doc. No. 9-3* at 2-6 (citations to medical records omitted).

"Despite the tendency of all rights 'to declare themselves absolute to their logical extreme,' there are obviously limits beyond which the equal protection analysis may not be pressed....  The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,'... nor does it require the State to 'equalize [prison] conditions.'" *Ross v. Moffitt*, 417 U.S. 600, 611-612 (1974); *Hammond v. Auburn University*, 669 F.Supp. 1555, 1563 (M.D. Ala. 1987) ("The Equal Protection Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally.").  To establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279

17

F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)." *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006). "[O]fficial action will not be held unconstitutional solely because it results in a ... disproportionate impact.... Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977). "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Since this case is before the court on properly supported motions for summary judgment from the defendants, Butler bears the burden of producing evidence which would be admissible at trial sufficient to show: (i) the defendants provided more favorable treatment to other similarly situated inmates, i.e., inmates whose medical conditions could

18

not be controlled while at work release, and (ii) the decision to deny him favorable treatment resulted from intentional discrimination. *Celotex*, 477 U.S. at 322-324; *Anderson*, 477 U.S. at 249 (to preclude summary judgment, plaintiff must present significant probative evidence showing defendants provided more favorable treatment to similarly situated persons and did so as the result of intentional discrimination); *E & T Realty Company v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987), *cert. denied*, 485 U.S. 961 (1988) (Intentional discrimination on the part of the defendants in providing the challenged disparate treatment is required.  "Mere error or mistake in judgment" or "[e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause.").  The plaintiff cannot rest on conclusory allegations of a constitutional violation to defeat summary judgment nor is "[t]he mere existence of a scintilla of evidence in support of [his] position" sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 252; *Waddell*, 276 F.3d at 1279 (conclusory allegations based solely on subjective beliefs are insufficient to oppose summary judgment).

Butler fails to meet his pleading burden, as he does not allege that the defendants treated him differently from other similarly situated inmates. Instead, Butler concedes that he and other work release inmates who failed to manage their diabetic conditions properly as directed by medical personnel were all transferred from the work release program. Thus, Butler's "equal protection claim necessarily fails first because he has not shown that

he was treated differently from other, similarly situated prisoners." *Sweet*, 467 F.3d at 1319.  Moreover, it is undisputed that correctional officials based the decision to remove Butler from work release on the worsening of Butler's diabetic condition while on work release due to his inability to properly manage this condition and the resulting need to provide medical treatment/supervision in a more controlled environment.  Thus, the record is devoid of evidence that the defendants acted due to purposeful discrimination. Under applicable federal law, the allegations presented by Butler are insufficient to demonstrate an equal protection violation and summary judgement is due to be granted in favor of the defendants on this claim.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before June 8, 2012, the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general

objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 25th day of May, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE